# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____
                                                )
**ERIC M. DICOLOGERO,**                         )
                                                )        **Civil Action No.**
       **Plaintiff,**                    )        **19-11550-FDS**
                                                )
       **v.**                           )
                                                )
**ANDREW SAUL, Commissioner,**                  )
**Social Security Administration,**             )
                                                )
       **Defendant.**                   )
_____)

## MEMORANDUM AND ORDER ON CROSS MOTIONS REGARDING
## DECISION OF THE COMMISSIONER

**SAYLOR, C.J.**

This is an appeal of a final decision of the Commissioner of the Social Security

Administration ("SSA").  On June 25, 2018, the Administrative Law Judge ("ALJ") issued a

decision concluding that plaintiff Eric Michael Dicologero is not disabled.  On October 23, 2018,

the SSA Appeals Council declined review.

Plaintiff filed this action seeking reversal of the Commissioner's decision.  The

Commissioner has moved to affirm the decision.  For the reasons set forth below, the decision

will be affirmed.

## I.    Background

The following is a summary of the relevant evidence in the administrative record

("A.R.").

A.     **Factual Background**

Eric Michael Dicologero was born August 26, 1966.  He completed high school and

worked full-time as a letter carrier for the United States Postal Service from 1986 through

January 16, 2016.  (A.R. (Dkt. No. 8) at 45, 66).

1.     **December 31, 2014 Injury and Treatment**

On December 31, 2014, Dicologero herniated his L5-S1 disc.  (*Id.* at 322).  A lumbar

MRI taken in February 2015 showed disc bulges at L3-L4 and L4-L5 and possible "small disc

protrusion/extruded disc" at L5-S1.  (*Id.* at 359).

In May 2015, he saw Scott Pladel, a physician's assistant to Dr. Joseph Abate.  (*Id.* at

322).  Pladel noted that Dicologero had filed a disability claim with the Post Office but was

denied because of the "delay prior to notification of his injury," and soon returned to work full-

time despite chronic pain.  (*Id.*).

In July and August 2015, Dicologero saw Dr. Abate twice.  (*Id.* 325-28).  After both

visits, Dr. Abate noted that Dicologero was experiencing chronic pain and intermittent additional

symptoms, but had declined the recommended epidural injections.  (*Id.*).

In September 2015, Dicologero saw another physician's assistant in Dr. Abate's clinic,

Robert McQuaid.  (*Id.* at 329).  McQuaid wrote that Dicologero was doing well at work, and that

his "reflexes and screening neurologic exam [were] normal, [and] sensation [was] intact."  (*Id.*).

A month later, during an October 2015 examination with Dr. Abate, Dicologero reported

"exquisite pain" in his back, numbness down his leg, and "the loss of sensation in the bottom of

his foot."  (*Id.* at 331).

On October 28, 2015, Dicologero saw Dr. Emad Younan upon referral from Dr. Abate. (*Id.* at 333).  Dr. Younan noted that Dicologero was reporting significant and increasing pain, but without any precipitating factor.  (*Id.*).  He recommended an epidural injection.  (*Id.*).

On November 23, 2015, Dicologero met again with Dr. Abate.  (*Id.* at 336).  Dr. Abate recorded tenseness, limited motion of the lumbar spine, and decreased ankle reflexes.  (*Id.*). Despite being "strongly" recommended for epidural injections, Dicologero rejected them and instead decided to treat the injury with heat, rest, and exercise, with Percocets for pain relief. (*Id.*).

### 2.    January 16, 2016 Car Accident

On January 16, 2016, while driving a Postal Service Jeep at work, another motorist rear-ended the vehicle, causing it to collide with two other cars, roll over several times, and strike a sign before coming to rest.  (*Id.* at 303).

Dicologero was taken to the hospital, where he received a diagnosis of back pain and scalp lacerations.  (*Id.* at 307).  He was discharged the same day with instructions to follow up with his primary-care physician.  (*Id.*).  The physician's assistant who examined him in the hospital noted that Dicologero exhibited full strength and range of motion throughout his upper and lower extremities, and experienced "[n]o numbness, tingling, weakness or paralysis."  (*Id.* at 388-90).

### 3.    Post-Accident Treatment

On January 20, 2016, Dicologero followed up with McQuaid and Dr. Abate (*Id.* at 343).  That examination showed lumbar tenderness and spasm, diffuse tenderness in both knees, and restricted motion in the cervical spine area.  (*Id.*).  Straight-leg raise testing was "positive for hamstring tightness," but Dicologero was "[n]eurologically intact."  (*Id.*).  McQuaid

prescribed physical therapy and Percocets for pain relief.  (*Id.*).  Dicologero later reported that he could not attend physical therapy because of his symptoms, which included headaches, confusion, dizziness, difficulty walking, and an inability to turn his neck.  (*Id.* at 341).

During an examination on February 1, 2016, Dr. Abate noted that Dicologero was confused, had marked spasm and tenderness in the cervical spine, had "[p]ainful [straight-leg raising] with significant decrease in ankle jerk," and was unable to tolerate any motion testing in his lumbar spine. (*Id.* at 341).  Dr. Abate declared him totally disabled and prescribed heat, rest, exercise, physical therapy when possible, and Percocets for pain relief.  (*Id.* at 342).

On February 23, 2016, Dicologero went to McQuaid with disability paperwork for the Office of Worker's Compensation Programs ("OWCP").  (*Id.* at 339).  He stated that his physical therapy was not helping.  McQuaid responded that Dicologero had just started physical therapy and must be patient.  (*Id.*).

On March 4, 2016, a physician's assistant, Ralph Emile, examined Dicologero and noted that he was not in distress, but had "mild" cervical tenderness with normal range of motion, mild lumbar tenderness, and normal reflexes.  (*Id.* at 369).

Only four days later, on March 8, 2016, Dr. Abate noted that Dicologero had significant radicular back pain, with headaches and neck and shoulder pain.  (*Id.* at 338).  On examination, he was showing "significant spasm and limitation of the lumbar spine with marked positive straight leg raising on the right with head back sign," and "[d]ecreased right ankle jerk with weakness."  (*Id.*).

On May 15, 2016, Dicologero sought emergency treatment for a "dry cough." (*Id.* at 384).  He denied experiencing back pain and did not appear to be in acute distress.  (*Id.*).

Eight days later, on May 23, 2016, Dr. Abate wrote a letter to OWCP stating that Dicologero had a significant L5-S1 disc herniation and was "totally and permanently disabled for any occupation." (*Id.* at 357). However, in a treatment note on May 19, 2016, Dr. Abate had noted that physical therapy "has helped considerably with decreasing [Dicologero's] pain," and that Dicologero continued to refuse an EMG/nerve conduction study, epidural steroid injections, and surgery. (*Id.* at 345). Dicologero asked to continue with physical therapy and Percocets, and both McQuaid and Dr. Abate obliged. (*Id.* at 345, 347).

On June 16, 2016, Dr. Abate's notes shifted in tone and form. He wrote that Dicologero was a "47-year-old disabled letter carrier with severe lumbar disc rupture and right sciatica," who was now presenting with "severe pain and limitation of the right elbow." (*Id.* at 355). He diagnosed "right lateral epicondylitis" (tennis elbow) and assessed a "significant partial" disability. (*Id.*). He administered a cortisone injection to the elbow. (*Id.*). That same day, Dr. Abate wrote a second progress note. (*Id.* at 356). This one did not mention the arm issues, but instead described Dicologero as a "49-year-old Post Office letter carrier with motor vehicle accident at work with significant traumatic aggravation of large herniated L5-S1 disc, right." (*Id.*). In that note, Dr. Abate described him as totally disabled with "moderate improvement only." (*Id.*).

On July 30, 2016, Dr. Abate again recorded two progress notes for Dicologero. (*Id.* at 353, 354). The first note covered his "severe right sciatica at work treated with Cortisone injection on 6/16/16," and noted "remarkable improvement with good motion and decreased pain." (*Id.* at 353). The second note discussed his signs of radiating low-back pain, but ongoing refusal of any treatment other than Percocets. (*Id.* at 354).

On August 17, 2016, Dicologero again met with Dr. Younan.  He reported right leg pain, but denied weakness in either lower extremity.  (*Id.* at 433).  He had positive straight leg raising on the right side, but no motor or sensory deficit.  (*Id.*).  Dr. Younan again recommended an epidural injection, but Dicologero was "very leery."  (*Id.*).

On November 21, 2016, Dicologero saw Dr. Abate.  (*Id.* at 445).  He said he had been trying to exercise by walking, but his activities were limited.  (*Id.*).  An examination revealed significant tenderness, restricted lumbar motion, and "mild resisted straight leg raising on the right with decreased ankle jerk and hypesthesia of lateral foot."  (*Id.*).

On December 3, 2016, Dicologero sought emergency treatment for rectal bleeding and dizziness.  (*Id.* at 380).  He refused a rectal examination, and a neurological examination showed normal results.  (*Id.*).  He denied "any numbness, tingling, weakness, or paralysis of any extremity," as well as any "headache or neck pain."  (*Id.*).  He admitted that he had been drinking more frequently over the past few days, but he did "not want detox" and left the hospital against medical advice.  (*Id.* at 380 & 383).

On December 19, 2016, Dicologero again met with Dr. Abate.  (*Id.* at 443).  Dr. Abate noted that he had "[m]arked resisted [straight-leg raising] on the right at 60 degrees," with diminished ankle reflexes and sensation.  (*Id.*).  Dr. Abate also noted that he had joined a gym "for exercise and pool." (*Id.*).

On January 16, 2017, Dicologero followed up with McQuaid.  (*Id.* at 410).  The physical examination notes indicate that he was "neurologically intact."  (*Id.*).  That was in contrast with prior examinations, where Dr. Abate reported decreased reflexes and sensation.  (*See, e.g.*, *id.* at 354, 443, 445).  McQuaid told Dicologero that his Percocet use was "becoming chronic and we need to cut back if he does not opt for surgery."  (*Id.* at 410).

A month later, Dicologero reportedly was "still hemming and hawing" about whether to have surgery or a cortisone injection.  (*Id.* at 411).  The notes from March and April 2017 appointments with McQuaid are similar, with the exception that rather than being "neurologically intact," (*id.* at 410), Dicologero was now exhibiting decreased sensation on his right side.  (*See id.* at 422–23).  He continued to reject surgery or injections.  (*See id.* at 420–23).

On July 10, 2017, Dicologero met again with Dr. Abate.  (*Id.* at 440).  He complained of sciatic radiation to his lower left leg, but Dr. Abate found no gross neurological deficit in his leg upon examination.  (*Id.*).  A lumbar X-ray showed "moderate degenerative changes of lower lumbar levels without significant change from previous [X]-ray."  (*Id.*).

On August 25, 2017, Dr. Abate filled out a disability questionnaire stating that he had seen Dicologero monthly for an L5-S1 disc herniation since January 20, 2016, and that he had based his diagnosis on a February 2016 MRI.  (*Id.* at 426–30).  Dr. Abate indicated that Dicologero could work sitting or standing/walking for less than an hour each on a workday.  (*Id.* at 428).  Furthermore, he would need to change positions every 15 to 20 minutes, constantly elevate his right leg to waist level, could occasionally lift up to five pounds.  He had frequent difficulty with attention and concentration, and would require unscheduled breaks and would miss more than three days of work per month.  (*Id.* at 427–30).  Dr. Abate opined, however, that Dicologero could frequently "grasp, turn, and twist objects" as well as "use hands/fingers for fine manipulations."  (*Id.* at 429).  Under a heading for "clinical and laboratory" findings supporting his diagnosis, Dr. Abate wrote "MRI Feb 2016."  (*Id.* at 426).

That same day, Dr. Abate told an OWCP claims examiner that Dicologero "remains totally and permanently disabled for any gainful employment as a direct result of work injury

[on] January 16, 2016." (*Id.* at 438–39).  Dr. Abate wrote a similar letter on September 7, 2018. (*Id.* at 12–13).  In both letters, Dr. Abate misstated the date of the February 5, 2015 lumbar MRI as February 5, 2016.  (*Id.* at 12, 438).

On September 29, 2017, Dr. Abate recorded in a follow-up evaluation report that Dicologero had discontinued physical therapy, and was planning a vacation to Brazil to begin in a few weeks.  (*Id.* at 436).

### 4.    Additional Medical Examinations or Opinions

On August 8, 2017, state medical consultant Dr. Ann Williams reviewed Dicologero's medical records.  (*Id.* at 93).  She concluded that he has exertional limitations that prevent him from frequently lifting more than 10 pounds or occasionally lifting more than 20 pounds; prevent him from standing, walking, or sitting more than 6 hours in an 8-hour workday; and reduce his ability to push or pull with his lower right extremity.  (*Id.*).  Dr. Williams further found that these limitations render him unable to perform his past relevant work, but leave him with the residual functional capacity ("RFC") to perform "light," "semi-skilled" work.  (*Id.* at 92–96).  Disability Adjudicator Elizabeth Tusini "thoroughly reviewed" Dicologero's file and affirmed "that the total evidence of record is sufficient and consistent to support [Dr. Williams's] proposed determination."  (*Id.* at 96).

Shortly before the administrative hearing under review, Dicologero's attorney arranged for Dr. Glen Seidman, an independent medical examiner, to provide a second opinion on Dicologero's RFC.  (*Id.* at 40–42).  On April 30, 2018, Dr. Seidman performed an examination and prepared a multiple impairment questionnaire that resembles Dr. Abate's August 25, 2017 findings.  Dr. Seidman's opinion, however, states that Dicologero's injury significantly limits him in reaching, handling, and fingering, and prevents him from lifting any amount of weight.

(*Id.* at 464–68).  He found such a limitation despite finding no abnormalities in Dicologero's arms, shoulders, wrists, or hands.  (*See id.*).  Notably, the postural limitations that Dr. Seidman found and recorded in the questionnaire are the same as the limitations that Dicologero self-reported at the appointment prior to the physical examination.  (*Compare id.* at 470 *with id.* at 466–67).

### 5.      Plaintiff's Hearing Testimony

On May 3, 2018, Dicologero testified at his administrative hearing that his injury causes him such severe pain that he is unable to sit or stand for more than 10 minutes, prepare his own meals, or perform any household chores.  (*Id.* at 62–64).  He also testified that he does not drive, cannot go grocery shopping, and, apart from attending church multiple times per week, spends much of his time watching television.  (*Id.* at 51–54).  Finally, he testified that his pain medication induces fatigue that causes him to take two- to three-hour naps almost daily.  (*Id.* at 54).

### B.      Procedural History

On January 10, 2017, Dicologero filed an application for Social Security Disability Insurance benefits, asserting that he became disabled on January 16, 2016.  (*Id.* at 30).

On April 19, 2017, his application was denied.  On August 11, 2017, it was again denied upon reconsideration.  On August 22, 2017, Dicologero requested a hearing before an ALJ.  (*Id.* at 19).  On May 3, 2018, that hearing was held, during which he testified.

On June 25, 2018, the ALJ issued a decision stating that Dicologero is not disabled under sections 216(i) and 223(d) of the Social Security Act.  (*Id.* at 19, 30).

On October 23, 2018, the SSA Appeals Council denied review of the ALJ's decision, prompting this appeal.  (Complaint (Dkt. No. 1) at 2).  Dicologero contends that the ALJ's

decision is not supported by substantial evidence, and therefore asks the Court to reverse the decision or remand for a new hearing.  (Pl. Br. (Dkt. No. 14) at 22).  The Commissioner has moved to affirm the ALJ's decision.  (Def. Br. (Dkt. No. 20) at 27).

## II.    Analysis

### A.    Standard of Review

Under § 205(g) of the Social Security Act, this Court may affirm, modify, or reverse the Commissioner's decision, with or without remanding the case for a rehearing.  42 U.S.C. § 405(g).  The ALJ's finding on any fact shall be conclusive if it is supported by "substantial evidence," and must be upheld "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion," even if the record could justify a different conclusion.  *Rodriguez v. Secretary of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981).

In applying the "substantial evidence" standard, the court must bear in mind that it is the province of the ALJ, not the courts, to find facts, decide issues of credibility, draw inferences from the record, and resolve conflicts of evidence.  *See Ortiz v. Secretary of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991).  Therefore, "[j]udicial review of a Social Security claim is limited to determining whether the ALJ used the proper legal standards and found facts based on the proper quantum of evidence."  *Ward v. Commissioner of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).

### B.    Standard for Entitlement to Disability Benefits

To qualify for Social Security Supplemental Income benefits, the applicant must demonstrate that he or she is "disabled" within the meaning of the Social Security Act.  The Social Security Act defines a "disability" as the "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be severe enough to prevent the applicant from performing not only his or her past work, but also any substantial gainful work existing in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1560(c)(1).

An applicant's impairment is evaluated under a five-step analysis set forth in the regulations promulgated under the statute. *See* 20 C.F.R. § 404.1520. The First Circuit has described the analytical sequence as follows:

> First, is the claimant currently employed? If he is, the claimant is automatically considered not disabled.
>
> Second, does the claimant have a severe impairment . . . mean[ing] an impairment 'which significantly limits his or her physical or mental capacity to perform basic work-related functions[?]' If the claimant does not have an impairment of at least this degree of severity, he is automatically considered not disabled.
>
> Third, does the claimant have an impairment equivalent to a specific list of impairments contained in . . . Appendix 1 [of the Social Security regulations at 20 CFR. § 404.1520(a)(4)(iii)]? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled . . . . If, however, his ability to perform basic work-related functions is impaired significantly (test 2) but there is no 'Appendix 1' impairment (test 3), the [ALJ] goes on to ask the fourth question:
>
> Fourth, does the claimant's impairment prevent him from performing work of the sort he has done in the past? If not, he is not disabled. If so, the agency asks the fifth question.
>
> Fifth, does the claimant's impairment prevent him from performing other work of the sort found in the economy? If so, he is disabled; if not, he is not disabled.

*Goodermote v. Secretary of Health & Human Servs.*, 690 F.2d 5, 6–7 (1st Cir. 1982).

The applicant bears the burden of proof for the first four inquiries. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes

such medical and other evidence of the existence thereof as the [ALJ] may require."). If the applicant has met his or her burden as to the first four inquiries, then the burden shifts to the Commissioner to present "evidence of specific jobs in the national economy that the applicant can still perform." *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001). In determining whether the applicant is capable of performing other work in the economy, the ALJ must assess the applicant's residual functional capacity in combination with vocational factors, including the applicant's age, education, and work experience. 20 C.F.R. § 404.1560(c).

C.      **The ALJ's Findings**

The ALJ followed this framework and concluded that Dicologero's claim fails at step five.

At step one, the ALJ found that Dicologero is not currently employed, and has not engaged in substantial gainful activity since January 16, 2016. (A.R. at 21). Specifically, the ALJ determined that he worked full time as a Mail Carrier, DOT# 230.367-010 (medium, semiskilled, SVP 4) from 1986 until the alleged onset date, at which time he was earning approximately $60,000 per year. (*See id.* at 29).

At step two, the ALJ found that Dicologero has a severe impairment: lumbar degenerative disc disease with radiculopathy. (*Id.* at 22).

At step three, the ALJ found that Dicologero has none of the impairments listed in Appendix 1 of the relevant regulations. (*Id.* at 24). The ALJ considered, but ultimately rejected, Listing 1.04 (disorders of the spine) for lack of evidence of nerve root compression. (*Id.*). The ALJ also noted that Dicologero "is able to walk with a normal gait without assistive devices" and "attends church three times per week, during which he must sit on a wooden church pew for the duration of the service." (*Id.*).

At step four, the ALJ found that Dicologero's severe impairment prevents him from performing his past work.  (*Id.* at 29).

At step five, the ALJ considered whether Dicologero, given his residual capacity, education, work experience, and age, could perform any other work.  *See* 20 C.F.R. § 404.1520(a)(4)(iv).  The ALJ found that he has the RFC to perform light work with the following restrictions:  he can only "occasionally push and pull with the right lower extremity[,] . . . occasionally climb ladders, ropes, and scaffolds[, and] . . . occasionally kneel. He [also] requires a sit/stand option that allows him to sit or stand alternatively at will . . . ." (A.R.  at 24.).  Crediting a vocational expert's testimony, the ALJ determined that these limitations would not prevent him from working as a finish inspector, cleaner and polisher, or small products assembler.  (*Id.* at 30).

In assessing an applicant's symptoms, an ALJ must follow a two-stage process.  First, the ALJ must determine whether there exists "objective medical evidence" of an impairment "which could reasonably be expected to produce the pain or other symptoms alleged."  20 C.F.R § 404.1529(a).  If such evidence exists, the ALJ must then assess how the intensity, persistence, and limiting effects of the impairment limit the plaintiff's work-related activity.  20 C.F.R. § 404.1529(c).

At stage one of that analysis, the ALJ found that the record contained objective medical evidence of degenerative disc disease that could reasonably produce Dicologero's alleged symptoms.  (A.R. at 25).

At stage two, the ALJ evaluated the intensity, persistence, and limiting effects of Dicologero's symptoms to determine the extent to which they limit his function.  The ALJ found the evidence insufficient "to substantiate the severity of the pain and degree of functional

limitations alleged by the claimant." (*Id.*).  In reaching that conclusion, the ALJ assigned little weight to several medical opinions of his attending physician, Dr. Abate.  (*Id.* at 27).  Instead, the ALJ determined that Dicologero's "refusal to avail himself of all offered treatment, as well as the evidence indicating that he was able to travel to Brazil and was attending a local gym for exercise and use of the pool, suggests that his pain is not as persistent or completely debilitating as these opinions indicate." (*Id.* at 27).  The ALJ also gave little weight to the opinions of independent examiner Dr. Seidman because "they appear to be based on the claimant's own reports of functioning at Exhibit 14F/2 rather than the medical examination findings." (*Id.* at 28).[1]  Finally, the ALJ gave significant weight to the finding of Dr. Williams, the state agency consultant, that Dicologero can perform light work with some restrictions because "[t]his finding is generally consistent with the medical record and is not contradicted by a persuasive medical source." (*Id.*).

### D.    Plaintiff's Objections

Dicologero raises the following objections to the ALJ's decision.

### 1.    Whether Plaintiff is *Per Se* Disabled Under Medical Listing 1.04A

First, Dicologero contends that his impairment meets the criteria of Medical Listing 1.04A and therefore constitutes an "Appendix 1 impairment." (Pl. Br. at 13–14).  If this argument were correct, the ALJ would be obliged to find that he is disabled at step three of the five-step analysis.

As the ALJ's decision recognizes, Listing 1.04A requires "[e]vidence of nerve root compression." 20 C.F.R. § 404.1520(a)(4)(iii).  The only relevant imaging evidence is a February 2015 MRI—taken nearly a year before the alleged onset date—that shows a focal area

---

[1] The ALJ also rejected a state agency medical consultant's opinion that Dicologero did not have a severe impairment at step two of the five-step analysis set forth in the Social Security regulations.  (A.R. at 28).

that "could represent a small focus of a disc herniation/extrusion" at L5-S1, with the "right lateral aspect of the L5-S1 disc abutting the exiting right S1 nerve root." (A.R. at 359). But "[n]erve-root *abutment* does not satisfy Listing 1.04A's requirement of nerve-root compression." *Momany v. Comm'r of Soc. Sec.*, WL 1306164, at *3 (E.D. Mich. Mar. 22, 2019) (emphasis in original); *see also Aldridge v. Colvin*, WL 4514914, at *4 (D. Ore. Aug. 23, 2013) (noting that an MRI showed "abutment of nerve roots by a disc bulge," but the reviewing physician "did not find, nor did any other physician, that nerve roots were compressed"). The ALJ correctly recognized that nowhere in any medical opinion—by Dr. Abate or otherwise—did any physician state that Dicologero suffered from nerve root compression nor, in fact, any nerve root damage that could be reasonably construed as a compression.[2] The ALJ's conclusion is therefore supported by the evidentiary record.

Unable to point to any evidence of nerve root compression, Dicologero argues that "[n]o medical opinions in this case found that the disc material extending into [Dicologero's] S1 nerve root is not compressing the nerve." (Pl. Reply Br. (Dkt. No. 21) at 2). The applicant, however, bears the burden of proof at step three, and accordingly that is not a basis on which to reverse the ALJ's decision.

### 2.    Whether the ALJ Erred in Giving Limited Weight to the Opinions of Dr. Abate

Dicologero next asserts that the ALJ was required to give controlling weight to the opinions of his treating physician, Dr. Abate. (Pl. Br. at 19).

---

[2] Defendant also contends that Dicologero's medical history does not satisfy other requirements of Listing 1.04A—specifically, because his symptoms were not consistently reported to, or observed by, physicians. (*See* Def. Br. At 15–16 (highlighting that various doctors reports inconsistently identify limits of spinal motion, motor loss, and positive straight leg raises)).

An ALJ must give a treating physician's opinion on the nature and severity of an applicant's impairments "controlling weight" when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record . . . ." 20 C.F.R. § 404.1527(c)(2).  If an opinion does not receive controlling weight, the ALJ must determine how much weight to give to the opinion by considering the length, nature, and extent of the treatment relationship, the opinion's supportability and consistency with the record as a whole, whether the treating source specializes in the area, and any other factors brought to the attention of the ALJ by the parties.   20 C.F.R. § 404.1527(c)(1)-(6).  The ALJ must also provide "good reasons" for assigning particular weight to a treating source's opinion and must state "specific reasons for the weight given to the treating source's medical opinion . . . [which] must be sufficiently specific to make [it] clear to any subsequent reviewers."  SSR 96-2p, 1996 WL 374188, at *5; *see also, e.g.*, *Shields v. Astrue*, 2011 WL 1233105, at *8 (D. Mass. Mar. 30, 2011) (Dein, M.J.) ("Because the [hearing officer] supported his rejection of the treating physician's opinions with express references to specific inconsistencies between the opinions and the record, [his] decision not to grant [the treating physician's] opinions significant probative weight was not improper."). The list of relevant factors "is non-exhaustive and presents the quintessential balancing test," allowing for the ALJ to "stress one factor over others."  *Conte v. McMahon*, 472 F. Supp. 2d 39, 48–49 (D. Mass. 2007).

Here, the ALJ explained that he could not give weight to Dr. Abate's statements that Dicologero is "disabled" and "cannot perform past work" because these "are not medical opinions but are administrative findings dispositive of a case, requiring familiarity with the regulations and legal standards set forth therein. Such issues are reserved to the Commissioner,

who cannot abdicate the statutory responsibility to determine the ultimate issue of disability."
(A.R. at 28). Dicologero does not dispute that conclusion.

The ALJ also considered the requisite factors and decided that all but one of Dr. Abate's
opinions were inconsistent with other substantial evidence in the record. (*Id.* at 27). The ALJ
credits Dr. Abate's "significant treating relationship" with Dicologero and his "expertise in
orthopedic medicine." (*Id.*). The opinion also credits, as consistent with the record evidence,
Dr. Abate's finding "that claimant does not have reaching, handling, or fingering limitations."
(*Id.* at 27).

But the ALJ also identified specific items of evidence in the record that were inconsistent
with Dr. Abate's conclusions. The ALJ noted that Dr. Abate's opinion "seemed to uncritically
accept as true most, if not all, of what [Dicologero] reported." (*Id.* at 27). In conjunction with
Dicologero's "refusal to avail himself of all offered treatment, as well as the evidence indicating
that he was able to travel to Brazil and was attending a local gym," the ALJ properly concluded
that "[Dicologero's] pain is not as persistent or completely debilitating as [Dr. Abate's] opinions
indicate." (*Id.*). Accordingly, the ALJ identified substantial evidence in the record that
contradicts Dr. Abate's opinions, thereby satisfying the requirements of § 404.1527. *See Halla
v. Colvin*, WL 234802, at *4 (D. Mass. Jan. 20, 2016) (affirming ALJ's reliance on evidence that
the claimant had "traveled by air to California to visit family and friends" to support a finding
that the claimant was not as limited as alleged)).

The ALJ was also justified in discounting Dr. Abate's conclusions because the medical
support underpinning those conclusions was often limited or indeed non-existent. Reports
containing "brief conclusory statements or the mere checking of boxes" are "entitled to relatively
little weight," *See Berriós Lopez v. Sec'y of Health & Human Servs.*, 951 F.2d 427, 431 (1st Cir.

1991).  Here, the support for Dr. Abate's diagnosis on the 2017 RFC Questionnaire simply says "MRI Feb. 2016." (A.R. at 426).  This fails to support his conclusions, in large part because the record contains no evidence that any MRI image was taken in 2016.  That discrepancy further supports the ALJ's conclusions as to Dr. Abate, including the inference that the doctor's conclusions "rely heavily" on Dicologero's subjective reports.  (*Id.* at 27).

Finally, Dicologero contends that the ALJ erred in discounting Dr. Abate's opinions based on his refusal to undergo the course of treatment that the doctor prescribed.  (Pl. Br. at 18).  In support, he points to Social Security Ruling 82-59, which provides that "[i]n an unusual case," extreme fear of surgery may justify a claimant's failure to undergo a recommended surgical operation.  SSR 82-59, 1982 WL 31384, at *3.  But that provision does not appear to apply to Dicologero's repeated refusals of epidural steroid *injections*, a far less invasive procedure.  It is also noteworthy that Dicologero reported receiving, and benefiting from, cortisone injections to treat tennis elbow.  (A.R. at 65).

In short, the ALJ considered the appropriate factors and properly justified his reasoning in assigning non-controlling weight to Dr. Abate's opinions.

### 3.    Whether the ALJ Erred in Giving Limited Weight to the Opinion of Dr. Seidman

Dicologero also disputes the limited weight assigned by the ALJ to the opinion of Dr. Seidman.  (Pl. Br. at 16–17).

The ALJ's duty to articulate "specific reasons" for weighting a medical opinion are relaxed when the opinion is that of a consultative examiner like Dr. Seidman.  See *Cruz v. Colvin*, WL 1068860, at *11 (D.R.I. Feb. 18, 2016) ("A[s] long as the report is considered, courts are reluctant to find that an ALJ's failure to articulate or explain the weight given to the

report of a consultative examiner necessarily amounts to error, never mind reversible error."), *adopted by* WL 1069059 (D.R.I. Mar. 17, 2016).

Under that deferential standard, the ALJ was justified in giving limited weight to Dr. Seidman's opinion.  The ALJ explained that Dr. Seidman's proposed functional restrictions deserved little weight because they "appear to be based on the claimant's own reports . . . rather than on the medical examination findings."  (A.R. at 28; *compare id.* at 470 with *id.* at 466)). Indeed, as the ALJ observed, during Dr. Seidman's examination, Dicologero exhibited a full active range of motion and intact sensation, motor strength, and reflexes in his upper extremities. (*Id.* at 28, 471).  Dr. Seidman's conclusions thus contradicted the evidence from his own examination.  Accordingly, the ALJ reasonably inferred that those conclusions were based primarily on Dicologero's subjective reports, not the medical evidence.  The ALJ's decision not to credit the conclusions was not improper under the circumstances.

### 4.      Whether the ALJ Erred in the Weight Given to the Opinion of Dr. Williams

Dicologero next contends that the ALJ erred by giving greater weight to the RFC determination of Dr. Williams, a non-treating state agency consultant, than to the opinions of Dr. Abate and Dr. Seidman.  (Pl. Br. at 17).

As a general matter, more weight is given to examining-source opinions than non-examining source opinions.  *See* 20 C.F.R. § 404.1527(c)(1).  However, the precise amount of weight that medical opinions should receive varies "[d]epending on the particular facts in a case."  20 C.F.R. § 404.1527(f)(1).

Here, the ALJ noted that Dr. Williams's August 8, 2017 opinion was more consistent with the medical record than the opinions of the treating and examining physicians.  (A.R. at 28–29).  And unlike the other opinions, his opinion is not contradicted by Dicologero's hearing

testimony.  (*Id.*).  For example, Dr. Williams, unlike Dr. Seidman and Dr. Abate, did not

conclude that Dicologero lacks upper body functionality despite evidence to the contrary.

Furthermore, and in any event, the ALJ did not grant Dr. Williams's opinion broad, uncritical

acceptance.  For example, her finding that Dicologero "does not have a severe spine impairment"

was given little weight, as it was inconsistent with the evidence received at the hearing.  (A.R. at

28).  In short, the evidence in the record provided sufficient reasons, that the ALJ identified with

particularity, to give the opinion of Dr. Williams more weight than those of the treating and

examining physicians.

Dicologero also alleges that it was impermissible for the ALJ to credit Dr. Williams's

opinion because it was based on a review of the record as it stood on August 8, 2017, without the

results of Dr. Seidman's April 30, 2018 examination.  (Pl. Br. at 17–18).  Although an ALJ may

not give significant weight to a medical opinion "based on a significantly incomplete record,"

*Alcantara v. Astrue*, 257 Fed. Appx. 333, 334 (1st Cir. 2007), the record here was sufficiently

complete without Dr. Seidman's contribution.  In *Alcantara*, for example, the medical opinion

predated the death of the plaintiff's father, and therefore reached the conclusion that the plaintiff

did not suffer from severe mental limitations without considering medical evidence of the

plaintiff's deteriorating mental condition after that traumatic event.  *See id.*

Here, in contrast, there is no evidence of any traumatic event or significant change in

Dicologero's condition that would materially alter the record between the date of Dr. Williams's

opinion in August 2017 and the date of the hearing in May 2018.  The reports from the follow-up

visits with Dr. Abate after August 2017 and Dr. Seidman's April 2018 physical examination

show no marked change in Dicologero's condition. (A.R. at 435–36, 464–73).  Dr. Williams's

opinion was therefore based on a substantially complete record, and the ALJ did not err in giving

it the weight he did.  *See King v. Comm'r of Social Security*, 2013 WL 1331209 at *7 (D. Mass. Mar. 28 2013) (finding that state agency physician's opinion that predated plaintiff's final visit with treating physician was based on complete record); see also *Evangelista v. Sec'y of Health & Human Servs.,* 826 F.2d 136, 144 (1st Cir. 1987) (rejecting idea that a "super-evaluator" must review the entire record and dictate RFC findings to ALJ).

In sum, the ALJ did not err in giving limited weight to the opinions of Dr. Abate or in giving more substantial weight to portions of Dr. Williams's opinion.

### 5.    **Whether the ALJ Improperly Evaluated Plaintiff's Subjective Statements**

Finally, Dicologero contends that the ALJ's evaluation of his subjective statements about the persistence and severity of his symptoms is not supported by substantial evidence.  (Pl. Br. at 20–22).

Again, the Court must uphold the ALJ's findings if a reasonable mind, reviewing the record as a whole, could accept it as adequate to support those conclusions under the substantial evidence standard.  *See Rodriguez*, 647 F.2d at 222.  Accordingly, in declining to significantly credit an applicant's testimony, the ALJ's analysis is "entitled to deference, especially when supported by specific findings." *Frustaglia v. Sec'y of Health & Human Servs.*, 829 F.2d 192, 195 (1st Cir. 1987).

Here, the ALJ made specific, record-based findings based on the evidence, including Dicologero's repeated refusals to undergo recommended treatment, his reported activities including exercising at a health club and traveling to Brazil, and evidence of a normal, unassisted gait.  (A.R. at 26-29).  That evidence contradicted his subjective complaints of a persistent, debilitating condition.  (*Id.*).  Accordingly, the Court will not disturb the ALJ's weighing of the evidence, including his apparent decision to discredit some of Dicologero's testimony.

In summary, the ALJ's conclusions are based on substantial evidence, and it cannot be said that no "reasonable mind, reviewing the evidence in the record as a whole, could accept [that evidence] as adequate to support his conclusion." *Teague v. Colvin*, 151 F. Supp. 3d 223, 226 (D. Mass. 2015) (quoting *Rodriguez*, 647 F.2d at 222).  The decision will therefore be affirmed.

## III.   <u>Conclusion</u>

For the foregoing reasons, plaintiff's motion for an order reversing the final decision of the Commissioner of the Social Security Administration is DENIED, and defendant's motion for an order to affirm the decision of the Commissioner is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV

Dated:  August 19, 2020               Chief Judge, United States District Court